IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

DAVID ALAN MANNING,                      )    CIVIL ACTION NO. 9:17-1016-MGL-BM
                                         )
                                         )
                         Plaintiff,      )
                                         )
v.                                       )    **REPORT AND RECOMMENDATION**
                                         )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social Security,  )
                                         )
                         Defendant.      )
_____)


The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff previously applied for Disability Insurance Benefits (DIB) on May 26, 2010, alleging disability beginning August 7, 2007 due to middle abdominal, groin, and spine problems. See Manning v. Colvin, No. 9:13-2183-MGL-BM, Court Docket No. 7 pp. 79-82.[1] Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on February 28, 2012. See Manning v. Colvin, No.

_____

[1]Although the parties did not reference Plaintiff's previous DIB application, the undersigned includes it for background purposes. The record cites in Manning v. Colvin, No. 9:13-2183-MGL-BM, are located in Court Docket Nos. 7 and 8. Aloe Creme Laboratories, Inc., v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970)[a federal court may take judicial notice of the contents of its own records]. Plaintiff's current counsel also represented him in that action.



9:13-2183-MGL-BM (hereinafter Manning I), Court Docket No. 7 pp. 53-71. The ALJ thereafter denied Plaintiff's claim in a decision issued March 9, 2012. See Manning I, Court Docket No. 7 pp. 36-46. The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. See Manning I, Court Docket No. 7, pp. 1-4.

Plaintiff then filed an action in this United States District Court, asserting that there was not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. However, on February 10, 2015, the Honorable Mary G. Lewis, United States District Judge, denied Plaintiff's claim and dismissed the case. See Manning I, Court Docket No. 21. See also Court Docket No. 16. Therefore, that Plaintiff was not disabled through March 9, 2012 (the date of the ALJ's decision on his 2010 DIB application) is established for purposes of Plaintiff's current claim. See Lively v. Secretary of Health and Human Services, 820 F.2d 1391, 1392 (4th Cir.1987) [Principles of res judicata apply in social security disability cases]; Fair v. Bowen, 885 F.2d 597, 600 (9th Cir.1989) [The doctrine of res judicata precludes a finding of disability prior to the date of denial of a claimant's previous application]. As such, in order to obtain DIB, Plaintiff must show that his condition substantially worsened after March 9, 2012. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir.1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

While his 2010 DIB lawsuit was still pending, Plaintiff had again applied for DIB as well as for Supplemental Security Income (SSI)[2] on July 1, 2013, alleging disability beginning May

_____

[2]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot (continued...)



22, 2012, due to persistent neuropathic pain, incontinence, chronic intractable testicular pain, anxiety, mood disorder due to medical condition, panic attacks, obsessive compulsive disorder, delusional disorder, and catatonic episodes.  (R.pp. 272-283, 312).  His claims in this application were again denied both initially and upon reconsideration.  A hearing on Plaintiff's claims was then held before an ALJ on November 5, 2015; (R.pp. 39-74); following which the ALJ denied Plaintiff's claims in a decision issued December 3, 2015. (R.pp. 16-38). The Appeals Council again denied Plaintiff's request for a review of the ALJ's decision, thereby making the ALJ's decision  the final decision of the Commissioner.  (R.pp. 1-6).

Plaintiff then filed this action in United States District Court.  Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded to the Commissioner for further proceedings.  The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence

---

[2](...continued)
establish that he was disabled during the insured period for DIB may still receive SSI benefits if he can establish that he is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005).  See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].



to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Medical Records

Since the Plaintiff primarily references medical records which were previously reviewed and considered by the Court in rejecting his earlier DIB application, the undersigned has included the summary of Plaintiff's medical records through January 2012 from the Report and Recommendation in Manning I for background purposes. In the below recitation from the earlier Report and Recommendation, any references to the ALJ's decision on that application and legal analysis are denoted as [   ] and have been omitted. This quotation only includes factual citations pertaining to the Court's review of Plaintiff's medical records submitted in his earlier case.



Plaintiff's medical records reflect [ ] that Plaintiff suffered an on the job injury on August 17, 2007 (his alleged disability onset date) when he suffered an injury to his groin area. Plaintiff was subsequently seen by Dr. Stephen Sisco for complaints of left groin pain and a possible hernia. On examination Dr. Sisco found that Plaintiff did have a reducible left inguinal hernia, but also noted that he was "otherwise relatively healthy". Surgical repair of the left inguinal hernia was recommended, and Plaintiff underwent hernia repair surgery with mesh on August 24, 2007. (R.pp. 492-493, 502). [ ] Plaintiff even returned to work and was doing a little bit of lifting at work, while also otherwise engaging in relatively normal activity. (R.p. 507). Plaintiff returned to see Dr. Sisco on October 10, 2007 complaining of some pain in his testicle and in the left groin area. An examination revealed only minimal tenderness with a well healed incision and no evidence of any hernia or other abnormality, and Dr. Sisco advised Plaintiff to remain on limited activity but not do any "heavy" lifting. (R.p. 507).

When Plaintiff continued to have complaints of pain, Dr. Sisco referred him to Dr. John Adams (a urologist) for an evaluation. (R.p. 509). Plaintiff was kept out of work for the interim. (R.p. 511). Plaintiff saw Dr. Adams on October 23, 2007, for complaints of pain and tenderness in his left testicular area and scrotum. On examination Plaintiff had no abnormalities in either inguinal area, while Plaintiff's scrotum and both testicles appeared to be normal. Dr. Adams also examined Plaintiff's back, which was found to be within normal limits, and it was noted that Plaintiff had a normal gait and station with full range of motion and normal muscle strength. Plaintiff also had no mood problems, and did not appear to be depressed. (R.pp. 534-535). Plaintiff was prescribed Lortab for his complaints of pain. (R.p. 536). The ALJ noted in his decision that Plaintiff's urology treatments thereafter continued to indicate overall normal examinations, with testicular pain being the only symptoms reported. (R.pp. 41, 537-549).

Plaintiff also continued to be seen by Dr. Sisco during this period of time, where his complaint continued to be groin pain. Even though Dr. Adams' records reflect that Plaintiff was experiencing no erectile dysfunction, he told Dr. Sisco that he was not able to have sex. Plaintiff also complained to Dr. Sisco of nausea, which had caused him to throw up "a few times" over a period of weeks. Although Dr. Sisco opined that Plaintiff was unable to return to his job during this period,[3] his examinations generally reflected that, while Plaintiff continued to complain of left testicle tenderness, his inguinal incision was well healed, there was no obvious hernia, and there were no other significant findings on examination. Plaintiff was treated

---

[3]Plaintiff's past work was classified as "medium" work; (R.p. 67); which involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). [ ]



with prescriptions and occasional injections. See generally, (R.pp. 512-514, 516-520).

Dr. Sisco also referred Plaintiff to Dr. Karen Eller (a pain management physician), asking her to see if some nerve block would help the Plaintiff. (R.p. 515). Plaintiff saw Dr. Eller on January 15, 2008 for his complaints of left testicular pain and nausea. Plaintiff also complained of depression because of pain and the fact that he was going through a divorce. Percocet was listed as an "improving factor". Dr. Eller performed musculoskeletal and neurological examinations, which were essentially normal, and Plaintiff also had a normal gait and normal strength with no lumbar tenderness. Dr. Eller did find that Plaintiff had hyperesthesia[4] in his left testicle, and he was provided with an injection for pain. Dr. Eller said that if that worked, they would repeat that procedure maybe one or two weeks for three or four injections, otherwise Plaintiff could start on Lyrica. (R.pp. 411-413). Similar findings were noted on a visit by Plaintiff to Dr. Eller on March 13, 2008. (R.pp. 420-421).

In addition to Dr. Eller, Plaintiff was also seen by Dr. Ian Marshall on January 21, 2008, where he was assessed with a pleasant mood and affect. Dr. Marshall's records reflect that Plaintiff had an essentially normal examination. Specifically, with respect to Plaintiff's genitourinary exam, Plaintiff's right scrotal contents were found to be completely normal, while his left scrotal contents revealed a "mildly" atrophic left testicle. Plaintiff told Dr. Marshall that the nerve blocks he had been receiving resulted in some improvement in his symptoms, although not a complete resolution, and Dr. Marshall believed the most likely explanation for Plaintiff's chronic left scrotal and testicular pain was a post traumatic neuropathic pain, an opinion apparently shared by Dr. Eller. Medications and nerve blocks were the recommended treatment. Although Dr. Marshall noted that an orchiectomy might be of some benefit, he believed that was "fairly unlikely". (R.pp. 487-488).

In sum, while Plaintiff continued to complain of testicular pain during this period, the medical evidence through early 2008 shows that his inguinal surgery repair was a success, there was no evidence of a hernia or other abnormality, Plaintiff had a normal gait and station with full range of motion and normal muscle strength, musculoskeletal and neurological examinations were essentially normal, and his treatment with medication and nerve blocks for his complaints of testicular pain, although not resulting in complete resolution, did provide some relief. [   ]

When Plaintiff returned to see Dr. Sisco on April 7, 2008 for a follow up he was not having any groin pain but still complained of a lot of testicular pain.

---

[4]Unusual or pathological sensitivity of the skin or of a particular sense to stimulation. http://www.merriam-webster.com/dictionary/hyperesthesia.



Examination at that time revealed a well healed inguinal incision with no evidence of any tenderness or abnormalities there, but Plaintiff did complain of being "exquisitely tender" along his left testicle, although not the scrotum itself. Dr. Sisco indicated that he would defer to Dr. Adams with respect to the management of Plaintiff's testicular pain. (R.p. 521). When Plaintiff returned to see Dr. Adams for his three month follow up on April 22, 2008, he advised Dr. Adams that his testicular pain was "intermittent but very severe". While review of Plaintiff's systems was positive for abdominal pain, all other systems were negative. Plaintiff was found on examination to be well developed and in no acute distress. Examination of Plaintiff's back was within normal limits, he had a normal gait and station, full range of motion, normal stability, and normal muscle strength and tone. Plaintiff's mood indicated no abnormalities, and he did not appear to be depressed. While Plaintiff complained of pain so severe it would sometimes cause nausea that radiated towards the upper scrotum, Plaintiff had no abnormalities in either inguinal area, nor were any abnormalities noted on the scrotum. A scrotal ultrasound showed that Plaintiff's left testicle was slightly smaller than the right, but under "active problems" Dr. Adams wrote "none". Dr. Adams' notes also reflect that he "explained the finding of the growth[5] and its possible consequences without surgery [an orchiectomy] and with surgery". (R.pp. 550-552).

Plaintiff ultimately decided on surgery, and underwent a left groin exploration, left orchiectomy, and cord block on June 2, 2008. (R.pp. 561-562). Three weeks post surgery, Plaintiff reported to Dr. Eller that the original pain he was having was gone since his surgery, that he had been doing very well, that he was able to decrease and even stop taking his pain medications, and that his swelling was gone. However, following this initial period of success, Plaintiff told Dr. Eller that on June 20, 2008, he had "had a sudden onset of pain" accompanied by bruising in the groin area. Plaintiff reported that he was presently taking Percocet, Lyrica, and Flomax; that he was experiencing no nausea, constipation, or grogginess; and had been sleeping well until the episode of June 20th. On examination Dr. Eller found Plaintiff to have a normal gait with normal strength, tone and sensation; and there was no lumbar tenderness and no obvious muscle spasms. Although there was also no induration and no sign of infection, she did observe bruising on the underside of the testicular area. Dr. Eller assessed Plaintiff with abdominal pain in his left lower quadrant, and adjusted his medications. (R.pp. 426-427).

Plaintiff returned to see Dr. Adams on June 25, 2008 for his post operative review of symptoms. Dr. Adams noted that there was some swelling and bruising post op after ochiectomy, and while Plaintiff's incision appeared to be closed and healing well, Plaintiff complained of pain in the testicular area on the left of several

---

[5]Although it is not clear from his report, Dr. Adams is apparently referring to some bilateral small epididymal cysts, which were shown on the scrotal ultrasound. (R.p. 551).



weeks duration.  Dr. Adams noted on review of systems that Plaintiff had scrotal tenderness, with all other systems being negative.  With respect to the scrotum itself, only "minimal" swelling and tenderness was noted.  Dr. Adams noted that the Plaintiff had not been lifting or doing any "heavy' work, and he encouraged Plaintiff to continue with decreased activity with regard to lifting and straining.  Instead, he suggested Plaintiff increase some of his other activities such as walking and other forms of gentle exercise, and to return if the pain reoccurred or increased. (R.pp. 567-569).

When Plaintiff went to see Dr. Sisco for a follow up appointment a few days later (July 7, 2008), he reported that he was "doing well at this time".  Plaintiff told Dr. Sysco that he had had "significant improvement in his pain almost immediately", although he was requiring some Percocet once or twice a day for some discomfort. Plaintiff also told Dr. Sysco that he had a follow up appointment with Dr. Adams in approximately four weeks, at which time he likely would be able to return to work. On examination Dr. Sysco found that Plaintiff had only "minimal" tenderness along his scrotum ("very, very faint").  (R.p. 522). [ ]

Plaintiff returned to see Dr. Adams on August 12, 2008 for his six week follow up post operation.  Plaintiff still had some swelling in the groin area, and Dr. Adams indicated he would "watch this area closely" while advising Plaintiff to take Keflex three times a day.   Plaintiff was experiencing no nausea/vomiting, constipation, diarrhea, or abdominal pain, he was noted to be well developed and well nourished and in no acute distress, while psychologically he was noted to be "[s]atisfied with life, not depressed".  Plaintiff was, however, still complaining of pain in the testicular area on the left, which Dr. Adams noted had been better for several weeks but was now  continuing to get worse.  (R.pp. 577-579).  Following that visit, Dr. Adams performed a left scrotal exploration on August 18, 2008, which included removal of a blood clot and fluid, and placement of a drain.  (R.pp. 318-319).  At his follow up visit on August 21, 2008, Plaintiff advised that his drain had been "draining fairly well", review of systems noted no abnormalities, Plaintiff was not depressed, and Dr. Adams advised Plaintiff to continue increasing his activities such as walking and other forms of gentle exercise.  (R.pp. 587-589).  Plaintiff's drain was removed the following day.  (R.pp. 591-592).

On August 28, 2008, Plaintiff advised Dr. Adams that he was having some swelling after removal of the drain with some discomfort, and also complained that another mass had started growing.  A review of systems was again essentially normal, with no indication of any complaints of nausea or vomiting.  Psychologically Plaintiff was again noted to be satisfied with his life and not depressed.  Dr. Adams noted that Plaintiff's scrotal mass did not appear to be malignant, but that he would watch this area closely and Plaintiff was advised to contact him immediately if there was any change.  (R.pp. 595-597).  When Plaintiff returned for a follow up visit on September



8

4, 2008, he was noted to be well developed, well nourished and in no acute distress; a review of Plaintiff's systems was essentially normal; and he was found to have only "moderate" swelling and tenderness in the left scrotum with his incision closed and healing well. Dr Adams adjusted Plaintiff's medications, and he was advised on when to return. (R.pp. 599-601). On October 3, 2008, Dr. Adams noted that Plaintiff was better with "some swelling" occurring when he was on his feet, otherwise he had improved slowly over the past three weeks. Dr. Adams advised Plaintiff to continue with decreased activity with regard to lifting and straining, while increasing other activities such as walking and other forms of gentle exercise. Plaintiff was admonished to watch any scrotal swelling closely and to contact Dr. Adams immediately if there was any change. (R.pp. 603-606). [  ]

On November 11, 2008 Plaintiff went back to see Dr. Eller to reestablish himself as a patient. Plaintiff complained to Dr. Eller of sharp, throbbing pain in the right testicle and left groin areas. Plaintiff denied any grogginess from medications, but told Dr. Eller (contrary to what he apparently was telling Dr. Adams) that his pain did cause nausea. Other than swelling in the suprapubic area, Plaintiff's examination findings were essentially normal, including normal gait and strength with no lumbar tenderness. Significantly, Dr. Eller noted that Plaintiff had been out of work for a long time, and that they had discussed trying to find Plaintiff a sedentary job so that he could transition back into the workplace. (R.pp. 430-431). Dr. Eller continued to provide Plaintiff with medications, including Avinza (a form of morphine); (R.pp. 432-433); and when Dr. Eller saw Plaintiff again on December 6, 2008, he advised he had no nausea. Otherwise his condition was unchanged. (R.p. 436).

[  ]

Plaintiff apparently did not return to see Dr. Adams again until January 8, 2010, over a year later. (R.p. 615). In the intervening year, Plaintiff continued to be followed by Dr. Sisco and Dr. Eller. Dr. Sysco noted on January 19, 2009 that he observed no hematoma or other abnormality, that Plaintiff had been released by Dr. Adams, that Dr. Eller was giving him some injections in his back, and that Plaintiff "finally has some very good relief". (R.p. 523). On April 6, 2009, Dr. Eller reported that Plaintiff had received "23 days of complete relief from his last injection". While Plaintiff told Dr. Eller that his pain had then returned when he "bent over in Walmart", at that point he thought "his pain [was] slightly better overall though he does not think he can go without pain meds". On a review of Plaintiff's systems he had no reports of nausea or grogginess, he had a normal neurological exam, and he had no lumbar problems. Dr. Eller assessed Plaintiff with left lower quadrant abdominal pain, and the possibility of Plaintiff having a Spinal Cord Stimulator (SCS) implanted was discussed. (R.pp. 451-452). [  ]



Prior to implementation of the Spinal Cord Stimulator, Plaintiff had a psychological evaluation conducted by Jana Sanders, a licensed counselor. Dr. Sanders concluded that Plaintiff did not meet the criteria for any mental disorder or substance abuse; (R.pp. 400-402); and Plaintiff thereafter had a trial SCS implantation on May 11, 2009. Following this procedure, Plaintiff told Dr. Eller that his pain was "very mild" and that he "felt much better with the stimulator". (R.pp. 458-459, 666). Plaintiff was then referred for permanent implantation, which was performed by Dr. Mark Netherton on August 4, 2009. (R.pp. 371-373). By August 20, 2009, Plaintiff advised Dr. Eller that he was pleased with the pain relief he was receiving from the SCS, with a fifty percent overall reduction in pain. Dr. Eller discussed weaning Plaintiff off of his meds, and a possible return to sedentary type work within three months. (R.pp. 673-674). [ ] Dr. Eller also noted that Plaintiff's case worker indicated there was a desk job available for him, but that Plaintiff "was now stating that he cannot do that while on pain meds per UPS protocol". However, Dr. Eller opined that Plaintiff was "fine to do desk work regardless of being on med". (R.p. 675).

On September 17, 2009, Plaintiff initially told Dr. Eller that he was having to "us[e] his SCS regularly". He now also complained of having pain in his right testicle, and again told Dr. Eller that he could not go back to work until he was off of opioids. Examination of that date found that Plaintiff had no nausea and no grogginess; neurologically he had a normal gait with normal muscle strength, tone and sensation; and no lumbar tenderness. Surprisingly, even though Plaintiff's primary complaint was that he had pain in his upper left middle scrotum, Dr. Eller noted that his genitalia was "not examined". Dr. Eller's notes further indicate that she had a "long talk" with the Plaintiff, and that she determined that he had actually been using his SCS only "a few days", and mostly at night, not "regularly" as he had initially claimed. There had even been an entire week when he had hardly turned it on. [  ] Dr. Eller stated that she was "very forthright with [Plaintiff] and told him that he needed to get on with his life, to accept the fact that he has pain, and to use his SCS". [  ]

Plaintiff thereafter returned to see Dr. Eller on October 15, 2009. Plaintiff complained of "severe" pain, and it was noted that Plaintiff had been weaned from Avinza, with Plaintiff stating that this had increased his pain. Plaintiff told Dr. Eller that he had hoped that he could return to his former employment, but that he was not sure how he could work with his sporadic, unpredictable and debilitating pain. However, Plaintiff indicated that he had experienced no nausea or grogginess, and he again had an essentially normal general examination. At this point Dr. Eller opined that Plaintiff was at maximum medical improvement, that she did not think that they would be able to completely wean Plaintiff from opioids, and that she did not think



that he would be able to "return to full time employment at UPS".[6] She opined that Plaintiff would need ongoing treatment in a pain center every one to three months, and recommended that he return to see Jana Sanders for additional counseling. (R.pp. 473-474).

Plaintiff began counseling again with Ms. Sanders in November 2009, and she indicated that, in her opinion, his prognosis was poor. (R.pp. 405-406, 409-410). Plaintiff also saw Dr. Sysco again on November 18, 2009 for a follow up evaluation. Dr. Sysco noted that Dr. Eller was managing Plaintiff's chronic pain syndrome with methadone and a nerve simulator, and that Plaintiff complained his medications were causing him to be constipated. Plaintiff told Dr. Sysco that Dr. Eller said he would not be able to "return to work" because he required chronic pain management. On examination Plaintiff exhibited tenderness along his left inguinal incision, but there was no evidence of any hernia. Dr. Sysco opined that Plaintiff appeared to be stable and managed with chronic therapy per Dr. Eller. (R.p. 526).

When Plaintiff saw Dr. Eller again on December 9, 2009, he complained of low back discomfort when he walked. However, he said his SCS was still helping and that he did not even use it at night. Plaintiff's general examination results were essentially normal, with again his genitalia not even being examined. (R.p. 483). On December 30, 2009, Dr. Eller wrote a "To Whom It May Concern" letter recommending that Plaintiff have a colonoscopy. (R.p. 485).

Plaintiff had a vocational evaluation performed on October 16, 2009 by Dr. Robert Brabham. Although none of Plaintiff's physical examination reports had ever indicated any significant lumbar or muscle problems, Dr. Brabham noted that Plaintiff presented using a cane. He also "wriggled and changed positions throughout the evaluation and kept a trash can beside him", advising that he might need to vomit due to experiencing nausea. It was noted that Plaintiff was receiving workers compensation. Plaintiff told Dr. Brabham that he regularly experienced extreme pain for hours at a time, that he was unable to sustain much activity, and that he spent most of his time reclining. Dr. Brabham went through Plaintiff's medical records, and stated that in reaching a vocational opinion due consideration had to be afforded to the fact that Plaintiff's pain required that he spend nearly his entire day resting or reclining, as well as to the anxiety and depression he experienced. Dr. Brabham concluded that Plaintiff's limitations with sitting or standing or nearly any movement or activity was vocationally such that even any sedentary work which might otherwise have been suggested was precluded, and that Plaintiff was unable to perform any substantial gainful work activity. (R.pp. 165-177).

---

[6]Plaintiff's past "medium" work level job. (R.p. 67). See also, n. 5, supra.



11

Plaintiff returned to see Dr. Adams on January 8, 2010. Dr. Adams noted his previous report finding that Plaintiff's post surgical results were excellent and that he should be able to return to work without limitation, with future treatment to be provided by Dr. Eller. Review of Plaintiff's systems was all essentially normal, with Plaintiff also being noted as being "not depressed". Plaintiff's right testicle was normal to palpation with no masses or tenderness noted, but Plaintiff told Dr. Adams that he was still having pain in his groin when he "moves a certain way", complained of some "post void spurts" and that he did not feel as though he emptied his bladder, and that he had pain in his groin when he had sexual relations and physical contact. (R.pp. 615-616). Plaintiff then returned to see Dr. Eller on February 8, 2010, advised her that he had incontinence that had begun about three months previous, and that his back had started to hurt at that time as well. Plaintiff had no complaints of nausea or grogginess, however, and on examination he was found to have a normal gait; normal strength, tone and sensation; with no lumbar tenderness. Plaintiff also reported that he was no longer using his SCS at night because it interfered with his sleep, resulting in severe pain in his back when he woke up. No changes were made to Plaintiff's medications. (R.pp. 689-690).

Because of Plaintiff's complaints of increased lower back pain, he underwent a thoracic spine CT and lumbar spine CT on March 2, 2010. The thoracic spine CT revealed no evidence of significant disc protrusion with only mild anterior osteophytes at T7-T10, and was otherwise normal. (R.p. 820). His lumbar spine CT was also essentially normal, revealing only mild disc protrusions at L3-4 and L4-5. (R.pp. 822-823). [   ]

On March 5, 2010 Plaintiff returned to see Dr. Adams regarding his voiding problems, complaining that since the placement of his stimulator he had some leakage after urination. Plaintiff also complained that he experienced "stabbing pain in the scrotum with nausea" upon "physical contact". Review of systems was negative, and Plaintiff was advised to follow up with urodynamics. (R.pp. 866-868). On March 25, 2010, Plaintiff was seen by Dr. Lewis Plzak (who apparently is with the same practice as Dr. Adams) for complaints of a painful testicle and leakage after urination following implantation of the stimulator. Urodynamics was again recommended. (R.pp. 863-865). Plaintiff followed up with Dr. Adams on June 10, 2010, again complaining of voiding dysfunction, some incontinence, as well as pain in the groin with foreplay. However, upon examination Plaintiff's bladder appeared to be empty, with no masses and no tenderness present, his right testicle was normal to palpation, and there were no other abnormalities noted. Plaintiff was told to return in six months. (R.pp. 875-878).

On July 8, 2010, Plaintiff's constipation was noted to be "much better", with Dr. Eller opining that Plaintiff "seems to be doing pretty well and feels that he is in a good place and that his pain is manageable with its present regimen". A general



12

examination performed by Dr. Eller was essentially normal. (R.p. 922). When Plaintiff returned for an SCS reprogram on July 12, 2010, Dr. Eller noted that Plaintiff was "very happy when he left, had back coverage as well". (R.p. 924). On August 20, 2010, Plaintiff underwent a lumbar myleogram, which was normal, while a CT scan of Plaintiff's lumbar spine performed that same date showed a shallow extradural defect continuous with the L4-5 disc without severe spinal stenosis or neuroforaminal stenosis. This imaging also found a normal appearance of the lower thoracic spine and thoracolumbar junction spinal cord. It was noted that the "etiology of [Plaintiff's] bowel and bladder dysfunction [was] not [able to be] ascertained on the basis of this examination". (R.pp. 890, 892).

On February 15, 2011, Plaintiff told Dr. Eller that he had been more active, playing more with his grand kids, that he was using his SCS regularly, and had had only one episode of incontinence. Nonetheless, Plaintiff complained of "continuous" left lower back and scrotum pain, even though on examination he was found to have a normal gait, normal strength, tone and sensation, with no lumbar tenderness. Again, Plaintiff's genitalia were not even examined. He told Dr. Eller that he was not sure that his methadone was helping as much anymore, so his dosage was increased. (R.p. 946).

Plaintiff went back to see Dr. Sysco on May 16, 2011 for a follow up evaluation, at which time he complained of a real sharp pain in his lower back "at times", as well as left testicular phantom pain. Plaintiff was told to return in four weeks. (R.p. 973). On August 18, 2011, Plaintiff returned to see Dr. Eller for a previously scheduled injection, at which time he told Dr. Eller that he had had "a miserable month". General examination findings, however, were again normal. Plaintiff's medications were continued with potential alternatives to treatment, such as radio frequency ablation, being discussed. Plaintiff had an injection, and was experiencing a forty percent decrease in pain at the time of discharge. (R.pp. 997-998).

On January 18, 2012, Dr. Eller completed a Multiple Impairment Questionnaire in which she opined that Plaintiff was "permanently disabled" due to "severe intractable pain". While noting the relatively mild imaging findings, Dr. Eller stated that there was "no objective test for [illegible] pain". Dr. Eller opined that Plaintiff experienced pain at a level of nine on a ten point scale, as well as fatigue at a level of nine on a ten point scale. She also opined that Plaintiff had unacceptable side effects from medication. She believed Plaintiff could sit and stand/walk for less than one hour in an eight hour work day, that Plaintiff could frequently lift or carry only ten pounds or less, that Plaintiff's symptoms would likely increase if placed in a competitive work environment, that Plaintiff's pain, fatigue and other symptoms would constantly interfere with his attention and concentration, and that Plaintiff's



13

impairments would likely require him to be absent from work two to three times per month. See generally, (R.pp. 984-989).

See Manning v. Colvin (Manning I), No. 13-2183, 2015 WL 545427 (D.S.C. Feb. 10, 2015).

On May 22, 2012, Jana Sanders, a Licensed Professional Counselor, opined that Plaintiff, who she had seen off and on since November 2006, suffered from extreme depression and anxiety.[7] She further opined that these symptoms "seem to be related to his health, inability to work and his place of living" and that "[d]ue to the severity of his symptoms he is unable to work." (R.p. 501). Sanders also opined that Plaintiff seemed "to be developing symptoms of Agoraphobia with Panic Attacks, Mania, Obsessive Compulsive Disorder and Delusional Disorder and Catatonic Episodes", and assigned him a GAF score of 39.[8]

On June 25, 2012, Plaintiff sought treatment for his chronic pain from Pardee Hendersonville Family Health Clinic in Hendersonville, North Carolina, as he had recently moved to that area. (R.p. 447). Dr. Kristopher Meadows noted that Plaintiff denied any joint and back pain, denied having anxiety and depression, and stated that he had phantom testicle pain. On physical

---

[7]While this medical record was submitted to the Appeals Council in Plaintiff's earlier case, the Court found that the Appeals Court properly noted that if Plaintiff believed this evidence established his disability on or after May 2012 (since it pertained to a time period after the ALJ's decision in March 2012), he could file a new claim for DIB, which Plaintiff has now done. See Manning v. Colvin, No. 9:13-2183-MGL-BM, 2015 WL 545427 **3, 17 (D.S.C. Feb. 10, 2015).

[8]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n. 1 (9th Cir.1999). A GAF score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). However, it should be noted that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including due to "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." See Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("DSM–V").

14



examination, Dr. Meadows found Plaintiff to be well developed, well nourished, and in no acute distress. (R.p. 448). Plaintiff's extremities evidenced no clubbing, cyanosis, edema, or deformity, he had full range of motion in all of his joints, and he had normal sensation, reflexes, coordination, muscle strength and tone. (R.p. 449). Dr. Meadows also noted that Plaintiff was alert and cooperative, with a normal mood and affect, and a normal attention span and concentration. (R.p. 449).

On or about September 10, 2012, Sanders noted[9] that Plaintiff had been seen in the past as follows: in 2006 after a work injury and surgery for 19 sessions for Adjustment Disorder with Depressed Mood; in April 2009, for a psychological evaluation for a spinal cord stimulator; in November 2009 for depression after chronic pain in the groin for 10 sessions; and in February 2011 for 8 additional sessions for Major Depressive Disorder. (R.p. 671).[10] Sanders opined that Plaintiff's depressive symptoms "seem to have increased over the past year" and that he had reported thoughts of ending his life. (R.p. 671).

On February 13, 2013, Plaintiff moved back to South Carolina and was seen by Dr. David Rowe at the Pain Center in Bluffton. (R.p. 543). Plaintiff was taking Methodone, and reported to Dr. Rowe that his "onset of the pain has been injury [in 2007] and has been occurring in constant pattern." (R.p. 543). However, while on examination Dr. Rowe observed that Plaintiff exhibited some moderate and severe tenderness in his paraspinal and facet joints, Plaintiff's upper and lower

---

[9]Plaintiff represents September 10, 2012 to be the approximate date for this record. However, Dr. Sanders' letter is not dated. (R.p. 671).

[10]All or the majority of these sessions predate Plaintiff's alleged onset date of disability in May 2012. However, since the eight sessions beginning in February 2011 are listed as sporadic sessions, it is not completely clear when his last session was held. (R.p. 671).



15

extremities were noted to be normal, and he had 5/5 (full) muscle strength with normal bilateral lower extremity muscle strength. Plaintiff 's mood and affect were also normal. (R.p. 544). On March 13, 2013, Plaintiff returned to the Pain Center Bluffton for a follow up appointment and was seen by Dr. Greg Lonscak. (R.p. 540). Dr. Lonscak found the Plaintiff to be alert and in no acute distress. Dr. Lonscak also opined that Plaintiff's mood and affect were normal, that he had normal muscle tone with no spasm or trigger points present on palpation, and that his ROM was normal including cervical spine movements with no pain. (R.p. 541). Plaintiff continued to take Methodone, which was increased from twice a day to three times a day, as needed. (R.p. 543).

In July 2013, Plaintiff reported to a medical provider that he was walking two miles/three times a day. (R.p. 512). In April and August 2014, Plaintiff was assessed with a GAF score of 60.[11] (R.pp. 799, 802). On September 17, 2015, Cashton B. Spivey, PH.D.. a licensed clinical psychologist, opined that Plaintiff would be able to understand simple and complex work instructions as well as be able to perform simple and complex tasks in the workplace. Dr. Spivey further opined that Plaintiff appeared to display a mild reduction in his energy, that his attention/concentration was fair, and that Plaintiff would "display difficulty relating well with others in the workplace due to the magnitude of his reported dysphoria and his reported emotional lability." (R.p. 782-783, 788). The state agency psychologists opined that Plaintiff could perform work involving no interaction with the public. (R.pp. 101-102, 135-136).

---

[11]A GAF of 51 to 60 indicates only moderate symptoms are present. Perry v. Apfel, No. 99-4091, 2000 WL 1475852 at *4 (D.Kan. July 18, 2000); Matchie v. Apfel, 92 F.Supp.2d 1208, 1211 (D.Kan. 2000).



**Discussion**

Plaintiff, who was forty-two years old on his alleged disability onset date, has a high school education and past relevant work as a driver and loader for United Parcel Service ("UPS"). (R.pp. 43, 313).  In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.  Additionally, Plaintiff has not disputed the ALJ's finding that he was last insured for DIB on March 31, 2014. See (R.p. 19). Therefore, in order to be eligible for DIB, Plaintiff must show that he was disabled on or before that date. Johnson v. Barnhart, 434 F.3d 650, 655-656 (4th Cir. 2005). With respect to Plaintiff's claim for SSI, however, Plaintiff's entitlement to benefits (assuming he establishes disability) would begin the month following the date of filing the application forward.  Pariseau v. Astrue, No. 07-268, 2008 WL 2414851, * 13 (D.R.I. June 13, 2008).

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff did suffer from the "severe" impairments[12] of status post left orchitectomy, status post inguinal hernia with mesh, degenerative disc disease, anxiety disorder, and a depressive disorder, he nevertheless retained the residual functional capacity (RFC) to perform light work[13] with the

---

[12]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[13]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job
(continued...)



ability to stand and/or walk for six hours during an eight-hour workday and sit for up to six hours; although he should be given the option to sit or stand during the work process at the workstation; only occasionally climb ladders, ropes, scaffolds, ramps and stairs; and occasionally balance, stoop, kneel, crouch and crawl. Plaintiff was also to avoid even moderate workplace hazards; and was limited to unskilled work defined as the performance of simple, routine and/or repetitive tasks; no ongoing interaction with the public; and no "team-type" interaction with co-workers but with incidental contact being allowed. (R.p. 24). At step four, the ALJ found that Plaintiff was unable to perform his past relevant work with these limitations. (R.p. 31). However, the ALJ obtained testimony from a vocational expert and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and was therefore not entitled to disability benefits. (R.pp. 31-32).

Plaintiff asserts that the decision is not supported by substantial evidence because the ALJ failed to specify in her RFC finding Plaintiff's need to alternate sitting and standing; erred in according more weight to the opinion of non-examining state agency consultants than to Plaintiff's treating physician; and erred by failing to investigate all of the possible reasons for Plaintiff's alleged period of noncompliance with prescribed treatment. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d at 642

---

[13](...continued)
is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



18

[Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

## I.

### (Alternate Sitting and Standing)

Plaintiff initially contends that the ALJ erred in her RFC assessment that he required the ability to alternate between sitting and standing during the work process at the workstation. (R.p. 24). Plaintiff asserts that the ALJ's description is not specific enough because it is unclear how long the Plaintiff can sit or stand before needing to alternate positions, citing to SSR 96-9p, which provides:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

See SSR 96–9p.

Plaintiff's argument is without merit.

First, while SSR 96-9p acknowledges that the RFC for alternate sitting and standing erodes the *sedentary* occupational base (but notes that the extent depends on the facts of the case), Plaintiff's RFC is for *light* work, not *sedentary* work. See Hodge v. Barnhart, 76 Fed.Appx. 797, 800 (9th Cir. 2003)["Ruling 96-9p does not apply to light work."] Plaintiff has not provided any case law to show that the ALJ was required to make a more specific finding under the facts of this case. Moreover, no greater specificity was required in this case for the simple reason that the ALJ restricted



Plaintiff to working jobs where he could sit or stand at the workplace. As such, "the reasonable implication of the ALJ's description was that the sit/stand option would be at [the plaintiff's] own volition." See Thompson v. Astrue, No. 09-1968, 2010 WL 3878729 at *7 (D.S.C. June 16, 2010), *adopted by*, 2010 WL 3880047, aff'd 442 Fed.Appx. 804 (4th Cir. 2011)(quoting Williams v. Barnhart, 140 Fed.Appx. 932, 937 (11 Cir. 2005)). No further description of how long Plaintiff would be required to sit or stand was required. See Pierpaoli v. Astrue, No. 10-2407, 2012 WL 265023, at * 3 (D.S.C. Jan. 30, 2012) [Rejecting claim of error where ALJ did not specify the frequency of the need for Plaintiff to sit or stand because an at-will sit/stand option means that the Plaintiff would have the flexibility to sit or stand as needed]; May v. Colvin, No. 13-1360, 2014 WL 3809500, at * 17 (D.S.C. July 30, 2014). As noted by Judge Currie in Pierpaoli, numerous case decisions support this conclusion. Pierpaoli, 2012 WL 265023, at * 3; see also Jimison ex rel. Sims v. Colvin, 513 Fed. Appx. 789, 792 (10th Cir. Mar. 21, 2013) ["The option to sit or stand at will permits the claimant to control the frequency at which she alternates positions. No greater specificity would be possible."]; cf. Lopez v. Astrue, No. 10-8024, 2012 WL 1030481 at * 10 (N.D.Ill. Mar. 27, 2012) ["A sit/stand option at will is frequently used in the Seventh Circuit, demonstrating that an 'at will' option is a sufficient specification of frequency of the individual's needs."].

In addition, the ALJ obtained Vocational Expert ("VE") testimony in this case, and the VE testified that he had observed jobs that would allow Plaintiff to work with this limitation, and then testified as to those jobs. (R.pp. 70-71). See Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980)[ALJ may rely on VE opinion based on training, experience and familiarity with skills necessary to function in various jobs]. Accordingly, Plaintiff has failed to show that he is entitled to relief on this issue.



**II.**

**(Treating Physician)**

Plaintiff also asserts that the ALJ erred in according more weight to the opinion of non-examining state agency consultants than to Plaintiff's treating physician. A treating physician's opinion is ordinarily entitled to great weight; see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R. §§ 404.1527, 416.927. See SSR 96-2p.[14] Under these regulations, a treating source's opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. §§ 404.1527(c), 416.927(c).

Plaintiff asserts that one of his treating physicians was Dr. Gabriel Fornari Jr., D.O. (doctor of osteopathic medicine). On November 2, 2015, three (3) days before Plaintiff's ALJ hearing, Dr. Fornari wrote a letter in support of Plaintiff obtaining disability benefits, stating that Plaintiff has been unable to work since 2007 in any capacity because of his physical and mental

---

[14]It is noted that for claims filed after March 27, 2017, the regulations have been amended, and that several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c (2017). However, the claim and ruling in the present case were filed before March 27, 2017, and Plaintiff's claim has therefore been analyzed pursuant to the treating physician rule set out above. As such, references in this Report and Recommendation are to the prior versions of the regulations in effect at the time of the ALJ's decision, unless otherwise specified.



problems. (R.pp. 803-804).[15] However, this asserted date of disability (2007) well exceeds Plaintiff's own claim of when his condition became disabling (May 22, 2012), and in fact includes a period of time in which it has already been conclusively established that Plaintiff was not disabled. See (R.pp. 272-283, 312); see also Manning I. Moreover, it does not appear (although it is unclear) that Dr. Fornari even had any treatment history with the Plaintiff during the time period relevant to this claim (post-May 2012). Dr. Fornari states in this letter that he first met the Plaintiff "approximately 10 years ago", when he was a patient of Dr. Fornari at his general practice clinic, but that (while he has maintained a friendship with the Plaintiff "over the years") Plaintiff is no longer a patient. (R.p. 803).

The ALJ concluded that Dr. Fornari's opinion was entitled to little weight, noting that Dr. Fornari no longer treated Plaintiff as a patient but was friends with him.[16] The ALJ did consider Dr. Fornari's statement and past treating relationship, as well as the description and print-out of the documentary film referred to by Dr. Fornari, in limiting Plaintiff to unskilled work with reduced interaction with others. (R.p. 29). However, the ALJ found Dr. Fornari's opinion on disability to be inconsistent with the evidence, as since Plaintiff's alleged onset date, his mental status examinations have been normal, with GAF scores generally in the mild to moderate range. (R.pp. 29-30). See (R.pp. 449, 541, 544, 787-788, 799, 802). The undersigned can find no reversible error in these findings. See Craig, 76 F.3d at 589-590 [rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]; Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ["[W]hen a treating physician's opinions

---

[15]This is the only record from Dr. Fornari in the evidence. No treatment notes from this physician have been cited by either party.

[16]Indeed, the ALJ further noted that Dr. Fornari stated that he had been involved in a 2012 documentary of the Plaintiff which Dr. Fornari had recommend his friend film.



are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ, not the Court, to weigh the evidence and resolve conflicts in that evidence].

Although Dr. Fornari opined that Plaintiff is unable to work in any capacity because of his combination of physical and mental problems (R.p. 803), the ALJ correctly noted that Dr. Fornari has not evaluated Plaintiff in a clinical setting or conducted a formal mental status examination of the Plaintiff in several years, rendering his opinion less persuasive. (R.p. 30). Conversely, on September 17, 2015 (two months before Dr. Fornari wrote his opinion letter), Dr. Spivey, a licensed clinical psychologist, performed a psychological evaluation of the Plaintiff and opined that Plaintiff had no restriction on his ability to understand and remember simple instructions, carry out simple instructions, understand and remember complex instructions, and to carry out complex instructions. Dr. Spivey further found that Plaintiff had only a mild restriction in his ability to make judgments on simple work-related decisions and ability to make judgments on complex work-related decisions. (R.p. 782). Dr. Spivey found Plaintiff had only mild restrictions on his ability to interact with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, and moderate restrictions on his ability to respond appropriately to usual work situations and to changes in a routine work setting, and concluded that Plaintiff did not have any other capabilities affected by his impairment(s). (R.p. 783). The ALJ generally gave great weight to Dr. Spivey's findings, and accounted for Plaintiff's mental impairments and Dr. Spivey's observation that Plaintiff exhibited only fair attention/concentration by limiting him to unskilled work. (R.p. 29). See 20 C.F.R. § 404.1527(d)(5) (2001) [opinion of a specialist about medical issues related to his or her area of specialty are entitled to more weight than the opinion of a physician who is not a specialist];



23

see also Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]. The ALJ also gave great weight to the opinion of the state agency psychological consultants, who determined that Plaintiff could perform work involving limited interaction with others. (R.pp. 30, 100-102, 114-116, 134-136, 140-142, 152). See Johnson, 434 F.3d at 657 [ALJ can give significant weight to opinions of medical expert who has thoroughly reviewed the record]. While Plaintiff claims the ALJ committed reversible error by crediting these opinions over that of Dr. Fornari, the undersigned can discern no reversible error in the ALJ's treatment of the state agency psychologists' RFC assessments. Stanley v. Barnhart, 116 F. App'x 427, 429 (4th Cir. 2004)[disagreeing with argument that ALJ improperly gave more weight to RFC assessments of non-examining state agency physicians over those of examining physicians]; Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014) [noting that opinions from state agency consultants may be entitled to even greater weight than the opinions of treating or examining sources].

In sum, the ALJ properly considered and analyzed Dr. Fornari's opinion in conjunction with the evidence as a whole, and the decision does not reflect a failure by the ALJ to properly consider his opinion or the record and evidence in this case. Krogmeier, 294 F.3d at 1023 ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; Bowen, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]; see also Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]. It



24

is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." Craft v. Apfel, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).  Here, as discussed above, the ALJ has given good reasons for the weight afforded to the opinion of Dr. Fornari, and there is no indication that the ALJ dredged up specious inconsistencies to discount his opinion.  Rather, Plaintiff appears to be asking the court to reweigh the evidence, which is not the province of this court. See Johnson, 434 F.3d at 653 [a reviewing court should not undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ].

Therefore, Plaintiff's argument that the decision in this case should be reversed due to an improper evaluation of the opinion evidence is without merit.  Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Hepp v. Astrue, 511 F.3d 798, 806 (8th cir. 2008) [Noting that the substantial evidence standard requires even less that a preponderance of the evidence]; Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is 'substantial evidence'].

### III.

### (Non-compliance)

Finally, Plaintiff asserts that the ALJ erred in failing to investigate all possible reasons for Plaintiff's alleged period of noncompliance with prescribed treatment.  Plaintiff contends that the ALJ discredited the Plaintiff for a period of non-compliance in September 2013 without fully



considering possibly valid reasons for Plaintiff's non-compliance. (R.pp. 27-28). Additionally, Plaintiff asserts that the ALJ did not discuss whether compliance with treatment would have allowed the Plaintiff to work. See SSR 82-59.

With regard to this issue, the ALJ referred to a September 2013 mental status examination including a note from Plaintiff's counselor, Sanders, that Plaintiff had been "poor" in terms of compliance. (R.pp. 27-28). The ALJ further found, however, that Plaintiff's treatment notes indicated that his anxiety and depression stabilized with medications, and that in April 2014, Plaintiff stated that he was doing well and reported improvement of his psychiatric symptoms after taking his prescribed psycho tropic medications. (R.p. 28). The ALJ noted that Plaintiff's mental examination was completely normal and that he had an assigned GAF of 60, indicating at most the presence of only moderate symptoms. (R.pp. 28-29, 799-800). The ALJ also noted another similar evaluation in August 2014, which again noted Plaintiff's mental status examination was normal and again assigned Plaintiff a GAF score of 60. (R.pp. 28-29, 801-802).

In order to be disabled, Plaintiff's impairment must last twelve (12) continuous months in duration. See 20 C.F.R. §§ 404.1509, 416.909. Even though here the ALJ did not discuss Plaintiff's reasons for non-compliance with prescribed treatment, the ALJ did set forth a thorough examination of Plaintiff's entire medical records after his alleged onset date, with the notation about non-compliance only dealing with a single examination. Plaintiff's non-compliance with taking his medications in September 2013 was not a basis for the ALJ's decision. See Burch v. Barnhart, 400 F.3d 676, 679 (9ᵗʰ Cir. 2005)["A decision of the ALJ will not be reversed for errors that are harmless"]. The ALJ further specifically discussed Plaintiff's records which supported a finding that Plaintiff was not disabled for a twelve (12) month period, including that when he subsequently took



26

his medications his condition improved with no notations about non-compliance being considered other than with respect to the one single examination noted.  Accordingly, the ALJ made a rational interpretation of the overall record, and appropriately found that Plaintiff was not disabled.  See discussion, supra; see also Batson v. Commissioner of Social Security, 359 F.3d 1190, 1196 (9th Cir. 2004)["When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ"].

The ALJ's failure to determine whether Plaintiff's failure to follow prescribed treatment was justified in September 2013 is not necessary for the outcome of this case.  Therefore, even if the ALJ's failure to resolve this ambiguity was error, it was harmless under the facts of this case, as

> [a]n ALJ's error is harmless where the ALJ would have reached the same conclusion notwithstanding the initial error.  Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  Bradley v. Colvin, 2015 WL 5725832, at *4 (S.D.W. Va. Sept. 30, 2015) (quoting  Shinseki v. Sanders, 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)).

Woodbury v. Colvin, No. 15-2635-DCN, 2016 WL 5539525, at *7 (D.S.C. Sept. 30, 2016); see also Loveless v. Comm'r, Soc. Sec. Admin., 678 Fed.Appx. 866, 869 (11th Cir. 2017) [factual error in assessing medical opinion harmless when it was not the basis for the ALJ's decision and additional reasons to discount opinion offered].

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984).  As previously noted, if the record contains substantial evidence to support the decision



(i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 22, 2018
Charleston, South Carolina



28

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).